AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### Southern District of California

7/26/17

**UNSEALED PER ORDER OF COURT**

FILED

JUL 03 2017

CLERK U S DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY_____ DEPUTY

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Information that is stored at Facebook, 1601 Willow Road, Menlo Park, California  94025

)
)
)
)
)
)

Case No. 17MJ2172

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-4

located in the _____Northern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B-3

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 844(f)(1) and (2), and 844(i) | Malicious Damage to Buildings and Real Property Receiving Federal Financial Assistance by Means of Fire; Malicious Damage to Buildings or Real Property Affecting Interstate Commerce by Means of Fire or an Explosive |

The application is based on these facts:

See attached affidavit of ATF Senior Special Agent Matthew Beals

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

ATF Senior Special Agent Matthew Beals
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 7/3/17

_____
*Judge's signature*

City and state:  San Diego, California

Magistrage Judge William V. Gallo
*Printed name and title*



## **ATTACHMENT A-4**

This warrant applies to information associated with Facebook User Name "tyler.carender," with the Facebook ID Account Number 100000987896726 and Vanity Name "Tyler Carender," that is stored at premises owned, maintained, controlled, or operated by Facebook, 1601 Willow Road, Menlo Park, California 94025

# ATTACHMENT B-3

## I.    Service of Warrant

The officer executing the warrant shall permit Facebook, as custodian of the computer files described in Section II below, to locate the files and copy them onto removable electronic storage media and deliver the same to the officer.

## II.    Items Subject to Seizure

All subscriber and/or user information; all electronic mail; chat history; images; text messages; histories; activity logs and all other documentation showing the user's posts and other Facebook activities; profile and profile information, including status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; Friend lists, groups and networks of which the user is a member; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; information about the user's access and use of Facebook applications; method of payment; detailed billing records; access logs; transactional data; and any other files associated with the following account:

> Facebook User Name "tyler.carender," with the Facebook ID Account
> Number 100000987896726 and Vanity Name "Tyler Carender"

The search of the data supplied by Facebook, Inc., pursuant to this warrant will be conducted as provided in the "Procedures for Electronically Stored Information" of the affidavit submitted in support of this search warrant and will be limited to:

    a.    Communications, data, or attachments relating to the manufacture of an incendiary bomb or other destructive device or explosive, or the commission of arsons by fire;

    b.    Communications, data, or attachments tending to identify others involved in the criminal activity described below;

    c.    Communications, data, or attachments third parties with whom Tyler CARENDER discussed the criminal activities described below;

d.      Communications, data, or attachments relating to the anonymous tipster who provided information to San Diego Crime Stoppers in November 2016, regarding the above described criminal activities;

e.      Communications, data, or attachments relating to research of, visits to, or other connections with, St. Andrew's Episcopal Church ("Church") and/or Oak Creek Middle School ("School"), in Encinitas, California;

f.      Communications, data, or attachments relating to the research or viewing of news articles and reports about the arsons that occurred at the Church or School in the fall of 2016;

g.      Communications, data, or attachments relating to the motivation for committing the arsons that occurred at the Church or School, including but not limited to evidence of student disciplinary action taken by the San Dieguito Union High School District against Tyler CARENDER;

h.      Communications, data, or attachments relating to the whereabouts of Tyler CARENDER and any criminal associates or co-conspirators at the time of arsons committed at Church or School in the fall of 2016; and

i.      Communications, data, or attachments that tend to provide context to the information described above, such as direct messages sent or received in temporal proximity  to any relevant communications, or communications, data, or attachments tending to identify the user of or person with control over the Facebook account, with Facebook User Name "tyler.carender," Facebook ID Account Number 100000987896726, and Vanity Name "Tyler Carender,"

during the time period from April 2010 through present, which tend to prove violations of federal law, including malicious damage to buildings and real property affecting interstate commerce by means of fire and explosive, in violation of 18 U.S.C. § 844(i), malicious damage to a building and real property receiving Federal financial assistance by means of fire, in violation of 18 U.S.C. § 844(f)(1) and (f)(2).

**AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT**

I, Matthew Beals, being duly sworn, state:

## I.    INTRODUCTION

1.    This affidavit is submitted in support of an application for a search warrant pursuant to 18 U.S.C. 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A), for information associated with Facebook User Name "tyler.carender," with the Facebook ID Account Number 100000987896726 and Vanity Name "Tyler Carender" (hereinafter the **"SUBJECT ACCOUNT"**), used by Tyler Carender ("CARENDER"), and stored at the premises owned, maintained, controlled, or operated by Facebook, 1601 Willow Road, Menlo Park, California 94025, more fully described in Attachment A-4.

2.    On June 16, 2017, a federal grand jury in the Southern District of California returned a three-count sealed indictment charging CARENDER with: (a) malicious damage to buildings and real property affecting interstate commerce by means of fire and explosive, in violation of 18 U.S.C. § 844(i) (Counts 1 and 3); and (b) malicious damage to a building and real property receiving Federal financial assistance by means of fire, in violation of 18 U.S.C. § 844(f)(1) and (f)(2) (Count 2).

3.    The charges contained in the sealed indictment arise from CARENDER's commission of three arsons in the Encinitas, California area during

a one-month time span in the fall of 2016.   Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") Special Agents and San Diego Sheriff's Department ("SDSD") Detectives from the SDSD Bomb/Arson Unit investigated the three arsons.  As set forth below, that investigation revealed that CARENDER used the **SUBJECT ACCOUNT** to post comments about one of the fires on Facebook. Additionally, as discussed below, investigators obtained subscriber and other non-content information for the **SUBJECT ACCOUNT** and CARENDER'S phone.[1] These toll records evidence that during the time periods preceding and following the arsons, CARENDER used both the **SUBJECT ACCOUNT** and his phone to communicate with third parties.  The investigation also indicates that CARENDER confessed that he committed the arsons to at least one of those third parties.

4.      As more fully described herein, there is probable cause to believe that within the **SUBJECT ACCOUNT**, more fully described in Attachment A-4, will be found evidence of violations of federal law, namely, malicious damage to buildings and real property affecting interstate commerce by means of fire and explosive, in violation of 18 U.S.C. § 844(i), malicious damage to a building and real property receiving Federal financial assistance by means of fire, in violation of 18 U.S.C. § 844(f)(1) and (f)(2), as more fully described in Attachment B-3.

---

[1]      The records for the **SUBJECT ACCOUNT** and CARENDER's phone were obtained via a court order pursuant to 18 U.S.C. § 2703(c) and (d).

## II.   **EXPERIENCE AND TRAINING**

5.      I am employed as a Senior Special Agent/Certified Fire Investigator ("SSA\CFI") by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), United States Department of Justice, and have been so employed for approximately 16 years.   I am currently assigned to the San Diego Field Office, Group I – Arson/Explosives.  I am a graduate of the Federal Law Enforcement Training Center and the ATF National Academy.  As a result of my training and experience as an ATF agent, I am familiar with federal and state criminal laws, including federal laws pertaining to arson, explosives and firearms.  My primary duties at ATF have been the enforcement of federal firearm, arson and explosive laws. I have also participated in the searches of numerous residences, vehicles and businesses involving violations of federal and state law.

6.      My knowledge of the facts alleged in this affidavit arises from my training and experience, my personal observations, my participation in the federal investigation described herein, my conversations with other law enforcement agents, and my review of documents obtained during this investigation.  Because this affidavit is submitted for the limited purpose of securing a search warrant as described herein, it does not include every fact known to me concerning this investigation.

### III.  **FACEBOOK**

7.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

8.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook, passwords, Facebook security questions and answers (for passwords retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

9.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend request."  If the recipient of a "Friend request" accepts the requests, then the two users will become "Friends" for the purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's

account includes a list of that user's "Friends" and a "News Feed, "which highlights information about the user's "Friends," such as status updates, profile changes, upcoming events, and birthdays.

10.     Facebook users can select different levels of privacy for the communications and information associate with their Facebook accounts.   By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users.   A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that user can adjust to control, for example, the types of notifications they receive from Facebook.

11.     Facebook users can create profiles that include photographs, lists of personal interests, and other information.   Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.   A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

12.     Facebook has a Photos application, where users can upload an unlimited number of albums and photos. Another feature of the Photos application is the ability to "tag" (i.e., label) other Facebook users in a photo or video. For

Facebook's purposes, the photos associated with a user's account will include all photos upload by that user that have not been deleted, as well as all photos uploaded by any user that have that user tagged in them.

13. Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail message, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

## IV.   PROBABLE CAUSE

### A.   CARENDER is the User of the SUBJECT ACCOUNT

14. In or about June 2017, investigators reviewed photographs depicted on the publicly available profile for the **SUBJECT ACCOUNT**. Based on a comparison of those photographs with known photographs of CARENDER obtained from government databases, it appears that CARENDER is the user of the Account.

15.     Additionally, subscriber records obtained from Facebook reveal that the subscriber of the **SUBJECT ACCOUNT** is "Tyler Carender," who opened the account on April 21, 2010.   After opening the account, the subscriber subsequently verified that his cell phone number was (760) 712-7008.   I know that this number is CARENDER's telephone number for the following reasons.   As discussed below, in January 2017, CARENDER provided this number to a third party, P.G. Additionally, a January 10, 2015, a SDSD crime/incident report lists CARENDER as the victim of the assault, with the same telephone number.   Finally, the subscriber for telephone number (760) 712-7008 is Hilda Oatley, at 1190 Island View Lane, Encinitas, California.   SDSD records reveal that Oatley is CARENDER's mother. The investigation also reveals that CARENDER lives with his mother at the Island View Lane residence ("CARENDER's home").

**B.     The Arsons**

16.     As discussed below, from October 22, 2016, through November 12, 2016, the Encinitas Fire Department ("EFD") responded to three fires in the Encinitas area.   The first and third fire occurred at the St. Andrew's Episcopal Church located at 890 Balour Drive ("the Church"); and the second fire occurred at Oak Crest Middle School located at 675 Balour Drive ("the School"). CARENDER's home is adjacent to the School and approximately 400 yards walking distance from the Church.

### October 22, 2016 -- The Church Youth Center Arson

17.   On Saturday, October 22, 2016, at approximately 5:00 a.m., a fire occurred at the Church, which was reported by a neighbor who saw the flames. EFD firefighters and investigators from the San Diego Sheriff's Department ("SDSD") Bomb/Arson Unit as well as ATF responded.  The Church had four freestanding structures, including the main Church, the Parish Hall, Preschool, and the Friendship House/Counseling/Youth Center ("Youth Center").  EFD firefighters were able to contain the fire to the Youth Center, which kept it from spreading to the adjacent structures.  The Parish Hall was located just a few feet away from the Youth Center.

18.   After the firefighters suppressed the fire, fire investigators from the SDSD Bomb/Arson Unit began their investigation to determine the origin and cause of the fire.  It is the opinion of the SDSD investigators and myself that the fire was set by an open flame to combustible materials on the landing of an exterior doorway to the Youth Center.  That opinion is based on an exterior and interior examination of the structure, and the ability to rule out weather or other accidental causes based upon the items available for analysis (e.g., lighting fixtures, outlets, appliances, etc.). Although there were no ignitable liquids (e.g., gasoline) found in the fire debris, based upon the entire investigation, including CARENDER's confession to a third party, it was determined that the fire was incendiary in nature, i.e., deliberately set with the intent to cause a fire to occur in an area where the fire should not be.

19.    During the investigation of the fire, investigators also located a dry chemical extinguishing agent (like the kind expelled from a fire extinguisher) on a concrete sidewalk, which ran long the west side of the Parish Hall toward the Youth Center.    Investigators also observed several footprints in the chemical residue. Investigators located two expended fire extinguishers concealed behind a group of bushes adjacent to another pathway located between the Youth Center and Parish Hall.  The investigation revealed that the extinguishers did not belong to the Church and neither SDSD patrol units dispatched to the scene nor EFD personnel deployed any fire extinguishers at the scene.    Additionally, at least two sets of footprints found on the sidewalk did not appear to match the footwear of anyone on the scene. One set of footprints appeared to be the sole pattern for a Van's brand type of shoe. As discussed below, a third party subsequently observed CARENDER wearing Van's shoes.

20.    Because of the extensive damage to the Youth Center, the Church subsequently razed the structure.  Church officials estimate the loss from the fire at approximately $200,000.

### October 29, 2016 – The School Arson

21.    One week later, on Saturday, October 29, 2016, at approximately 3:35 a.m., a fire occurred at the School – specifically within the administration building. A Rancho Santa Fe Security Officer, who responded to an activated motion alarm,

discovered the fire. Shortly thereafter, EFD fire engines responded to the scene, followed by fire investigators from ATF and the SDSD. EFD firefighters suppressed the fire. However, the administration building suffered extensive fire damage. Investigators estimated a total loss of approximately $300,000 -- $200,000 for the structure and $100,000 for the contents.

22. Following the suppression of the fire, I conducted an origin and cause investigation. During my examination of the exterior and interior of the structure, a San Diego Fire-Rescue Department canine handler used his ATF-issued Accelerant Detection Canine (ADC) at the scene. ADCs are trained to alert to the presence of ignitable liquids (gasoline, lighter fluid, etc.) in fire debris, which may have been used to start a fire. The ADC alerted to several areas in and around a modular office located in the southeast corner of the administration building, including parts of a bookshelf and carpet. Investigators collected wood shelving and a piece of wood from the bookshelf, as well as a section of carpet from the office, for analysis by an ATF laboratory. An ATF forensic chemist subsequently determined that gasoline was present on the recovered portions of the bookshelf and carpet. Based on my examination of the structure, which included fire damage analysis, knowledge of fire dynamics, witness statements and that laboratory analysis, I determined that the fire originated in the southeast office of the administration building and that the cause was incendiary, deliberately set by the use of flame applied to gasoline vapors.

23.     Because the school gate was locked at the time EFD arrived, it appears that the arsonist who set fire to the administration building likely gained access to the School grounds by foot.  As discussed below, the backyard of CARENDER'S home abuts the School.

24.     The School is part of the San Dieguito Union High School District ("SDUHSD").  According to the Chief Financial Officer ("CFO") of the SDUHSD, the District receives Federal financial assistance.  Specifically, the CFO estimated that for the school year ending in June 2017, the District would receive over 4.3 million dollars in financial assistance via grants from the U.S. Department of Education and the U.S. Department of Agriculture.

### November 12, 2016, -- The Church Preschool Fire

25.     Two weeks later, on Saturday, November 12, 2016, a second fire occurred at the Church.  This time, the fire occurred at the Preschool, which is a freestanding structure on the Church property, located west of the Parish Hall and Youth Center.

26.     The fire was reported by a neighbor who lives in a residence directly across from the Church.  The neighbor called "911" after being notified about the fire by his stepdaughter.  In the early morning hours, his stepdaughter was asleep in her upstairs bedroom, which faced west toward the Church.  At approximately 5:00

a.m., the stepdaughter awoke to sounds of a metal gate opening and closing and a chain link fence being hit by something at the Church Preschool.   After hearing the sound of the gate and chain link fence a second time, the stepdaughter looked outsider her window.  She then observed an individual running northbound through the grass area at the Church closest to Balour Drive.  A short time later, she heard additional noises coming from the Church that sounded like the fire that occurred on October 22, 2016.  She then saw some smoke filling the air above the Church.

27.    The stepdaughter's description of the suspect fleeing the scene generally matches the description of CARENDER.  The stepdaughter described the individual as a white male, approximately 20 years to 30 years in age, 5'7" to 5'9" tall, with a skinny build.  He was wearing dark shorts and an orange-colored t-shirt and possibly a hat.   According to biographical information, CARENDER is a white male, approximately 20 years of age, with a thin build, 5'4" tall and weighing 101 pounds.  In addition, the direction that the suspect running was northward, where Island View Lane intersects with Balour Drive.  CARENDER's home is located at the east end of Island View Lane, a dead-end street.

28.    Within minutes after receiving the 911 call, SDSD Deputies arrived at the scene and established a perimeter to search for the suspect seen running from the scene.  However, Deputies were unable to locate the suspect. When EFD firefighters arrived at the scene, they observed a fire through one of the windows where the

Preschool office was located.  They also observed that one of the windows was broken.  Firefighters contained the fire to this office, although there was significant damage to the Preschool -- estimated at $25,000 by Church officials.

29.     SDSD Bomb and Arson Detectives and ATF agents subsequently conducted another origin and cause investigation.   In the Preschool Office, investigators noticed the odor of gasoline, and they collected a partially burnt, wet, clump of paper as well as remnants of a glass bottle, which contained fabric consistent with a wick.  An ATF forensic chemist subsequently determined that gasoline was present on the paper, glass and fabric.  An ATF explosive enforcement expert reviewed the reports of investigation including the forensic chemist's report, and examined the glass fragments and cloth.  The expert determined that the materials were consistent with the use of an explosive that is an improvised incendiary bomb -- commonly referred to as a "Molotov Cocktail."  In sum, investigators determined that the origin of the fire was the Preschool office and the cause was incendiary, by the use of an explosive, i.e., a glass bottle filled with gasoline that contained a fabric wick, which was lit and thrown into the Preschool Office through a window.

30.     Several of the buildings that comprise the Church complex are involved in ancillary activities, which affect interstate and/or foreign commerce.   The Preschool is a full-time preschool, with paid teachers and staff.  The Preschool is

licensed for 80 students, and admission is not limited to Church parishioners. The cost of yearly attendance ranges from approximately $4,000 to $5,000. On a weekly basis, the Parish Hall, which was in close proximity to both the Preschool and the Youth Center, was used to: (1) distribute services and foods from the San Diego Food Bank; and (2) prepare and serve a hot lunch to 80-100 families. Additionally, the Youth Center houses a Youth Group that is involved in both interstate and foreign commerce through its mission trips in which the group conducts a variety of service projects for individuals in Colorado, New Mexico and Mexico.

### C.   An Anonymous Tipster Identified CARENDER as the Arsonist, and Had Direct Communication with the CARENDER's Phone and the SUBJECT ACCOUNT

31.   On November 15, 2016, SDSD Detectives received a Crime Stoppers tip identifying "Tyler CARENDER" as the individual responsible for setting fires at the Church and the School. The tipster provided a cell phone number that matched the number for CARENDER's phone, and a physical description matching the description of CARENDER. The tipster also indicated that CARENDER had a prior DUI conviction. On November 18, 2016, the same anonymous tipster called again and provided an address for CARENDER of 1190 Island View Lane, Encinitas, California. Investigators confirmed that CARENDER was arrested by SDSD Deputies for DUI in 2015, and that on August 12, 2015, he pled guilty and was sentenced to five years' probation, and ordered to pay a $2,133.00 fine and complete

a special alcohol program. Records obtained from the California Department of Motor Vehicles, CARENDER's current employer, and the SDSD, all confirm that CARENDER resides at 1190 Island View Lane in Encinitas.

32.    Although the identity of the tipster who provided the information through Crime Stoppers is confidential, investigators learned his/her identity [and the phone he/she used] based upon an independent investigation of telephone toll records.  The nature and timing of the contacts support a finding that the tipster learned that CARENDER committed the arsons via direct communications with CARENDER.  Specifically, toll records received from Verizon Wireless reveal that from October 5, 2016, through November 12, 2016, CARENDER's phone was in contact with a telephone number used by the tipster on approximately fourteen occasions for voice calls and approximately 21 occasions for text messages. Investigators then obtained subscriber and toll information for tipster's telephone, which revealed that the tipster's telephone received incoming calls from CARENDER's phone following both the October 29, 2016, School Arson (3:35 a.m.) and the November 12, 2016, Church Preschool Arson (5:00 a.m.), as set forth in the chart below:

| Date | Time | Tipster's Phone Receives Incoming Call from: | Duration |
|---|---|---|---|
| 10/29/16 | 11:41 am<br>3:34 p.m. | CARENDER's phone<br>CARENDER's phone | 3 min.<br>8 min. |
| 11/12/16 | 6:59 p.m. | CARENDER's phone | 7 min. |

Additionally, the telephone toll records show that the tipster's telephone placed a 13-minute call to Crime Stoppers on November 15, 2016 and a ten-minute call to Crime Stoppers on November 18, 2016. As such, these toll records not only identify the tipster, but also make it likely that the tipster obtained information regarding CARENDER's involvement in the three arsons directly from CARENDER.

33. Additionally, investigators reviewed publicly available Facebook information, and determined that the tipster has a Facebook account. Non-content records for the **SUBJECT ACCOUNT** reveal that there was direct messaging with the tipster's Facebook account on May 9, 2017.

### D. The Proximity of CARENDER's home to the Arson Sites Provided CARENDER with the Opportunity to Commit the Arsons and Evade Apprehension

34. CARENDER's home is in close proximity to both the Church and the School. As depicted in the Google satellite map below: (1) the backyard of CARENDER's home abuts the School, and the distance from the Administration Building to CARENDER's backyard fence is approximately 120 yards; and (2) the distance from CARENDER's home to the Church Preschool and Youth Center is approximately 400 yards.



As such, after committing the arsons, CARENDER was easily able to avoid detection by running to his home within a couple of minutes of committing each arson, and hide any evidence (clothing, gas cans or containers, lighters, etc.) which might tie him to the arsons. In fact, as noted above, within minutes of the 911 call regarding the Preschool fire, Deputies arrived and established a perimeter in the area. However, they were unable to locate the suspect. The suspect was running north up Balour Drive toward the intersection of Island View Lane – the direction of CARENDER's home.

### E.      **CARENDER's Facebook Post Regarding the School Arson**

35.      As set forth below, a review of publicly available comments regarding a Facebook news article shows that CARENDER showed an unusual interest in the October 29, 2016, School fire.

36.      On October 29, 2016, at 6:40 a.m., ABC San Diego Channel 10 News (Channel 10 News) posted an article on its Facebook page reporting on the School fire, with a photo/video of firefighters battling the blaze and the following comment: *"An early morning fire tore through the admin building of Oak Crest Middle School in Encinitas. The damage was considerable. Arson investigators are on the scene."*

37.      At 9:25 a.m., CARENDER, using the **SUBJECT ACCOUNT**, posted a Facebook comment on the Channel 10 News story, stating *"wtf, I went to that middle school I really hope they catch the person."*

38.      Shortly after the fire, investigators saw CARENDER's Facebook post, and became suspicious because, at that time, the fire had not been classified as arson or incendiary in nature, nor had any such details been released outside of law enforcement personnel.[2]  Based on cell site history obtained for the CARENDER's telephone and time/attendance records obtained from CARENDER's employer, it

---

[2]      While the Channel 10 News Facebook article does mention that arson, investigators were on the scene, there is no mention that those investigators determined the cause of the fire was arson.

appears that CARENDER posted this comment while at work, via his phone.[3]

Approximately 3½ hours after the School arson, CARENDER began a 7:00 a.m. to

3:30 p.m. work shift at a Ralph's grocery store in Encinitas. At approximately 9:21

a.m., a four-minute outgoing call was made by CARENDER to his mother using a

cell tower that covers the location of Ralph's Encinitas. After that call was finished,

at 9:25 a.m., CARENDER then posted the above comment regarding the School fire.

In sum, this activity evidences CARENDER's interest in the School fire, i.e., he

actively searched the internet for news reports regarding the School fire and posted

his comment while at work.

### F.   Toll and Cell Site Information for CARENDER's phone and the SUBJECT ACCOUNT Show That CARENDER Communicated with Third Parties During the Months of the Arsons

39.   A review of the non-content records for the **SUBJECT ACCOUNT**

and CARENDER's phone (including cell site information) further evidences

CARENDER's involvement in the arsons and his possible communication with

others regarding the arsons, as set forth below. However, the utility of the cell site

information is somewhat limited, considering the close proximity of CARENDER's

home to the arson sites, i.e., the Church and the School.

---

[3]   CARENDER's time and attendance records were obtained via subpoena from his employer, Ralph's Encinitas, and cell site history for CARENDER's phone was obtained via Court order, pursuant to 18 U.S.C. § 2703(d).

40.    October 22, 2016 Church Youth Center Arson -- This fire occurred at approximately 5:00 a.m., and there are no calls or cell site information for CARENDER's phone during that relevant time period.  However, according to cell site information, three hours earlier at 2:19 a.m., CARENDER's phone placed a call to a third party (hereinafter referred to as "third party #1") via a cell tower in Encinitas, which does not cover the vicinity of either CARENDER's home or the Church.    This shows that during the early morning hours preceding the fire, CARENDER was not at home asleep.  Additionally, investigators reviewed publicly available Facebook information, and determined that the third party #1 has a Facebook account.  Non-content records for the **SUBJECT ACCOUNT** reveal that there was direct messaging with third party #1's Facebook account on October 1, 2016, December 21, 2016, and May 9 and 23, 2017.

41.    October 29, 2016, School Arson -- This fire occurred at approximately 3:40 a.m.  There are no calls or cell site information for CARENDER's phone from 12:00 midnight through approximately 9:00 a.m.  However, as noted above, at 9:21 a.m., while in the vicinity of Ralph's Encinitas, CARENDER's phone placed a call to CARENDER's mother.  Later that afternoon, as noted above, CARENDER's phone had two additional outgoing calls to the tipster's phone.

42.    November 12, 2016, Church Preschool Arson -- This fire occurred at approximately 5:00 a.m.  In the early morning hours preceding the fire -- from 1:49

a.m. to 1:56 a.m., the cell tower data shows that he was not near his home or the School. Rather, he was again in the greater Encinitas area. In addition, toll records show that from 1:44 a.m. to 2:22 a.m., CARENDER's phone was communicating with the same phone number by text (66 messages) or phone (8 incoming/outgoing/incomplete calls that were only a few seconds in duration). Investigation reveals that this phone is used by a resident of Rancho Santa Fe, who is believed to be friend of CARENDER based on their similar ages and call frequency with CARENDER's phone (hereinafter referred to as "third party #2").[4] At 4:37 a.m., CARENDER placed an outgoing call to third party #2 (5 seconds in duration). Cell tower data for this call placed him in the vicinity of the Church and CARENDER's home. This last call occurred just minutes before the Preschool fire was reported, and suggests that CARENDER was awake in the early morning hours just before the fire. Additionally, on the evening of November 12, 2016, CARENDER's phone again placed a telephone call to the tipster's phone.

43.    Additionally from October 2016 through November 2016, the **SUBJECT ACCOUNT** was also in contact with an approximately eleven other Facebook users, via direct messaging. These direct messages include messages sent

---

[4]    Investigators obtained cell site history for third party #2's telephone. Although investigators are still investigating whether third party #2 or others participated in committing the arsons with CARENDER, the available cell tower data does not place third party #2 near the Church or the School at the time of the arsons.

from the **SUBJECT ACCOUNT** to the Facebook accounts of third parties: (1) on November 12, 2016 at 3:55 a.m. Pacific Standard Time ("PST"), shortly before the Preschool fire; and (2) on October 22, 2016, at approximately 12:09 a.m. PST, approximately five hours before the Youth Center fire.

### G.  **CARENDER's Confession to "P.G."**

44.    After receiving the anonymous tip, SDSD Detectives learned that CARENDER was a student at Palomar College in San Marcos, and pursuing an Administration of Justice degree.

45.    On November 22, 2016, SDSD Detectives provided the Palomar College Police Department ("PCPD") with a bulletin referencing CARENDER as a "person-of-interest" in the Church and School arsons and requesting field interview information.  A Palomar College student (hereinafter referred to as "P.G."), who works as a Community Service Officer ("CSO") under the supervision of the PCPD, immediately saw the bulletin. P.G. then informed his/her Sergeant that he/she knew CARENDER through classes they had taken together.  P.G. agreed to work with investigators.  P.G.'s Sergeant contacted SDSD Detectives, who asked P.G. to cultivate a closer relationship with CARENDER and document and update investigators with information as it developed.

46.    In December 2016, P.G. and CARENDER had conversations at Palomar College on a couple of occasions.  During those meetings, they discussed

their shared desires to pursue law enforcement careers, and P.G.'s job as a CSO. During the course of one of those conversations, CARENDER stated that he lived in Encinitas. CARENDER stated that it was nice living in Encinitas with the exception of a recent "crime wave," which included an arsonist who was responsible for three fires. When P.G. asked CARENDER why he believed the fires were arson, CARENDER stated that police apparently saw a man fleeing the scene of one of the fires. CARENDER stated that there had not been a fire for over a month and that the arsonist "*probably realized what he was doing was wrong.*" When discussing their interest in law enforcement careers, CARENDER expressed concern about whether he would pass a background check and psychological examination.

47.   A new semester began in January 2017 and P.G. and CARENDER had a class together. During class, they exchanged cellphone numbers – with CARENDER providing P.G. with his telephone number – which matched the telephone number provided by the tipster. On February 9, 2017, during another conversation about P.G.'s law enforcement experience, CARENDER asked if P.G. had experience or training investigating arson, which CARENDER commented was difficult to solve. CARENDER again brought up the three arsons in Encinitas and P.G. asked where the fires occurred. CARENDER explained that the arsons occurred near CARENDER's home at a church and a school.

48.     On March 3, 2017, CARENDER and P.G. went on a hike near Torrey Pines State Reserve. P.G. picked-up CARENDER at his home on Island View Lane. While driving to Torrey Pines, P.G. began a conversation about the law enforcement officer application/certification process. CARENDER stated that he was especially nervous about the background check. First, CARENDER divulged the DUI he was charged with in 2015. P.G. alleviated CARENDER's concern by downplaying the likelihood of a DUI disqualifying him from consideration. P.G. asked if there was anything else in CARENDER's background that was causing him concern— particularly anything that he was *not* caught committing. P.G. suggested that the more CARENDER divulges to a third party, the less likely his psychological assessment would be adversely affected. CARENDER revealed that he had a history with drug use, been expelled from school, broken into vehicles, and committed a residential burglary with a friend. P.G. asked if there was anything else and CARENDER replied, *"There's one more thing, man, but I can't tell you. I could go to jail for the rest of my life."* P.G. reiterated the utility of discussing something like that with a third party, and assured CARENDER that unless it was murder or sexual assault, P.G. could be trusted to keep the information confidential. CARENDER replied, *"Do you remember those arsons in Encinitas I told you about?"* P.G. replied that he did and CARENDER stated, *"I did those."* Again, P.G. pretended to be unaffected by CARENDER's confession, and asked CARENDER why he

committed those acts. CARENDER stated that he was under the influence of alcohol during at least one of the arsons, and became visibly nervous and anxious about having confessed to committing the arsons and because he thought that he might have left fingerprints on some clay pots at one of the three crime scenes.[5]

49.    P.G. was genuinely surprised that CARENDER confessed committing the arsons, and then became nervous about being able to prove that their conversation actually occurred. As such, during the hike, P.G. used the voice-recorder function on his/her phone to record a small portion of their remaining conversation. In order to spur further conversation, P.G. again brought up CARENDER's involvement in the arsons. The pertinent portion of that conversation is transcribed below.

| | |
|---|---|
| P.G.: | I am glad you told me about that thing though man. |
| **CARENDER:** | **What? Oh yeah, me too, feels good.** |
| P.G.: | Feel a little better? |
| **CARENDER:** | **No, no, no.** |
| P.G.: | No? |
| **CARENDER:** | **Still, will, it will forever be there, nothing I can do about it.** |
| P.G.: | True. |
| **CARENDER:** | **I mean, I can . . .** |
| P.G.: | How many was it? |
| **CARENDER:** | **Three.** |

---

[5]    At the scene of the Church Preschool fire on November 12th, two clay pots were removed from their holder under the window to the Preschool Office, i.e., the origin of the fire. Investigators did not share this information [or any information outside of what was placed in the bulletin] with P.G.

| P.G.: | Yeah, like I said, you just keep your nose clean from now on. |
| **CARENDER:** | **First two were devastating, the third one wasn't so bad.** |
| P.G.: | Where were the first two? |
| **CARENDER:** | **School and building.** |
| P.G.: | Ah. |
| **CARENDER:** | **Completely torn down ...** |
| P.G.: | and the third one was there? |
| **CARENDER:** | **The same church, minor place.** |

50.     On the drive back to CARENDER's home, CARENDER pointed out the Church and School as the locations of the arsons. When referring to the Church, CARENDER specifically referenced how the building involved in the Church fire had been torn down.   When passing the School, P.G. jokingly questioned CARENDER's ability to walk up hill along a steep incline while intoxicated. CARENDER explained that he did not go up the hill, but that he hopped the fence bordering his house and the School.  Again, P.G. was not made privy to any of the aforementioned information by investigators, which corroborates the legitimacy of CARENDER's confession and involvement.   Following the hike, P.G. had text communications with CARENDER.   In those text communications, CARENDER thanked P.G. for "*listening brah*" and added, "*you have my trust.*"  P.G. responded that he was glad and added "*It's always good to confide in someone.*"  On the day of the hike, P.G. observed that CARENDER was wearing Van's shoes.  Immediately after the meeting, P.G. notified both his/her Sergeant and SDSD Detectives.  He/she

then memorialized the contact in a written report. Investigators obtained a digital copy of the above-referenced recording and screen shots of the text messages between CARENDER and P.G.

### H.   CARENDER's Connection to Arson Sites

51.     In April 2011, SDSD Deputies arrested CARENDER for negligently discharging an air soft rifle at Oak Crest Middle School students from the backyard of his home. According to the SDSD arrest reports for the 2011 incident, a teacher at the school identified CARENDER as the individual shooting BB pellets at her classroom from his backyard. She recognized CARENDER as a former student who had previously thrown rolls of toilet paper containing feces from his backyard over the fence and into the school. At the time of that incident, the teacher called the City of Encinitas code enforcement who handled the problem.

52.     Phone toll records reveal that on November 18, 2016, just six days after the last Church fire, CARENDER's phone placed a call to the Church, and the duration of the call was 68 seconds. The substance of that conversation is unknown. However, I have reviewed the Church directory, and neither CARENDER nor his mother appear to be members of the Church. Moreover, neither CARENDER nor his mother appear on the list of donors for the Church's Fire Repair Fund.

## I.   Affiant's Training and Experience with Arson Cases

53.   Based on my training and experience, consultation with other agents from ATF, and all of the facts and opinions set forth in this affidavit, I know:

a.   It is common for individuals who commit arsons using an explosive, such as an incendiary bomb or other destructive device, to conduct research related to the manufacture of such incendiary bombs/destructive devices via the internet and social media sites.

b.   Individuals who construct explosives or destructive devices, such as incendiary bombs, or who commit arson by fire, sometimes photograph and document their activities, and such evidence of their activities may be contained within their social media sites, including private messaging with third parties.

c.   It is common for individuals who commit arsons by means of fire or explosive to discuss such matters with co-conspirators via telephone, text messages, emails and social media – both before and after an arson – for the purpose of planning and providing updates to one another.

d.   It is also common that individuals who commit arsons by means of fire or explosive discuss their criminal activities with trusted third parties, including friends or loved ones, after the arson has been committed, via text messages, emails and social media.

e.   It is common for individuals who commit arsons by means of fire

or explosive to visit or research the planned site of the arson, prior to committing the arson, for the purposes of planning the successful execution of their criminal activity and their getaway, and evidence of such research or prior connection may be in their social media sites, including private messaging with third parties.

      g.     It is common for individuals who have committed arsons by means of fire or explosive to research and view news articles relating to the arsons, for several purposes, including monitoring law enforcement's investigation and response to the fire, as well as gratification; and evidence of such activity may be in their social media applications and communications.

      h.     I know that the motivation for individuals committing arsons can be varied and complicated – such motivations may include money, revenge, excitement, depression or anger, and evidence tending to show their motivation including prior history with individuals associated with the arson site may be found in their social media applications and communications

54.    Based on my training and experience, and my consultation with my fellow agents, I also believe that the evidence I seek remains in and will be found in the **SUBJECT ACCOUNT** despite the passage of time and in light of the fact that, according to records provided by Facebook, CARENDER has not deleted any of his messages and a preservation request is on file. Routinely, during previous cases and in the investigation discussed herein, agents have found electronic and digital

evidence dating back several months or even years relevant to an investigation. For example, I previously executed a search warrant for evidence relating to the illegal sale of a firearm to a prohibited person, and discovered email and text communications between the seller and the prohibited person, which occurred approximately fourteen months earlier.

## VI.   SEARCH PROTOCOL

### A.   Genuine Risk of Destruction of Evidence

55.   Based upon my experience and training, and the experience and training of other agents with whom I have communicated, electronically stored data can be permanently deleted or modified by users possessing basic computer skills. In this case, only if the subject receives advance warning of the execution of this warrant, will there be a genuine risk of destruction of evidence.

### B.   Prior Attempt to Obtain Evidence

56.   As set forth herein, pursuant to 18 U.S.C. § 2703(c) and (d), the United States obtained subscriber and other non-content information for the **SUBJECT ACCOUNT**. The United States is unware of any search warrant or § 2703(d) applications for the **SUBJECT ACCOUNT**.

### C.   Procedures for Electronically Stored Information

57.   Federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under

investigation. The personnel of Facebook are not. It would be inappropriate and impractical for federal agents to search the vast computer network of Facebook for the relevant accounts and then to analyze the contents of those accounts on the premises of Facebook. The impact on Facebook's business would be severe.

58.     Therefore, I request authority to seize all content, including electronic mail and attachments, stored instant messages, stored voice messages, photographs and any other content from the **SUBJECT ACCOUNT**, as described in Attachment B-3. In order to accomplish the objective of the search warrant with a minimum of interference with the business activities of Facebook, to protect the rights of the subject of the investigation and to effectively pursue this investigation, authority is sought to allow Facebook to make a digital copy of the entire contents of the accounts subject to seizure. That copy will be provided to me or to any authorized federal agent. The copy will be forensically imaged and the image will then be analyzed to identify communications and other data subject to seizure pursuant to Attachment B. Relevant data will be copied to separate media. The original media will be sealed and maintained to establish authenticity, if necessary.

59.     Analyzing the data to be provided by Facebook may require special technical skills, equipment and software. It also can be very time-consuming. Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data

in within the scope of the warrant. Merely finding a relevant "hit" does not end the review process. Certain file formats do not lend themselves to keyword searches and keyword search text. Many common electronic mail, database and spreadsheet applications, which files may have been attached to electronic mail, do not store data as searchable text. The data is saved in a proprietary non-text format. The volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases dramatically.

60.     Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months. Keywords need to be modified continuously based upon the results obtained. The personnel conducting the examination will complete the analysis within (90) days of receipt of the data from the service provider, absent further application to this court.

61.     Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize all electronic mails that identify any users of the **SUBJECT ACCOUNT** and any electronic mails sent or received in temporal proximity to incriminating electronic mails that provide context to the incrimination mails.

62.     All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

## VII.   **REQUEST FOR SEALING AND PRECLUSION OF NOTICE**

63.     Because the indictment is sealed and this investigation is ongoing, the disclosure this affidavit and warrant may adversely affect the prosecution and investigation of law enforcement.   Specifically, there is reason to believe that disclosure of the affidavit and warrant will result in destruction of or tampering with evidence or otherwise seriously jeopardize the investigation.   Even after the search warrant is executed on the **SUBJECT ACCOUNT** and CARENDER is arrested, the breadth of the investigation will not be known to CARENDER and any associates or coconspirators involved in the arsons.   Disclosure of the information contained in this affidavit may still affect the integrity of the investigation and the destruction of or tampering with evidence.   Accordingly, it is requested that this warrant and its related materials be sealed until further order of the Court. In addition, pursuant to Title 18, United States Code, Section 2705(b), it is requested that this Court order the electronic service provider to whom this warrant is directed not to notify anyone of the existence of this warrant, other than its personnel essential to compliance with the execution of this warrant until January 2, 2018, absent order from the Court.

## VIII. CONCLUSION

64.     Based on the foregoing, your affiant submits that there is probable cause to believe that violations of federal criminal law, namely, malicious damage to buildings and real property affecting interstate commerce by means of fire and explosive, in violation of 18 U.S.C. § 844(i), malicious damage to a building and real property receiving Federal financial assistance by means of fire, in violation of 18 U.S.C. § 844(f)(1) and (f)(2), have occurred, and that evidence of said violations, as described in Attachments B-3 will be found within the **SUBJECT ACCOUNT**.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Matthew Beals
SSA/CFI
ATF

Sworn to before me this
___3__ day of July ____ 2017

Hon. William V. Gallo
UNITED STATES MAGISTRATE JUDGE

## **ATTACHMENT A-4**

This warrant applies to information associated with Facebook User Name "tyler.carender," with the Facebook ID Account Number 100000987896726 and Vanity Name "Tyler Carender," that is stored at premises owned, maintained, controlled, or operated by Facebook, 1601 Willow Road, Menlo Park, California 94025

## **ATTACHMENT B-3**

### I.  **Service of Warrant**

The officer executing the warrant shall permit Facebook, as custodian of the computer files described in Section II below, to locate the files and copy them onto removable electronic storage media and deliver the same to the officer.

### II.  **Items Subject to Seizure**

All subscriber and/or user information; all electronic mail; chat history; images; text messages; histories; activity logs and all other documentation showing the user's posts and other Facebook activities; profile and profile information, including status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; Friend lists, groups and networks of which the user is a member; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; information about the user's access and use of Facebook applications; method of payment; detailed billing records; access logs; transactional data; and any other files associated with the following account:

> Facebook User Name "tyler.carender," with the Facebook ID Account
> Number 100000987896726 and Vanity Name "Tyler Carender"

The search of the data supplied by Facebook, Inc., pursuant to this warrant will be conducted as provided in the "Procedures for Electronically Stored Information" of the affidavit submitted in support of this search warrant and will be limited to:

> a.   Communications, data, or attachments relating to the manufacture of an incendiary bomb or other destructive device or explosive, or the commission of arsons by fire;

> b.   Communications, data, or attachments tending to identify others involved in the criminal activity described below;

> c.   Communications, data, or attachments third parties with whom Tyler CARENDER discussed the criminal activities described below;

ii

d.     Communications, data, or attachments relating to the anonymous tipster who provided information to San Diego Crime Stoppers in November 2016, regarding the above described criminal activities;

e.     Communications, data, or attachments relating to research of, visits to, or other connections with, St. Andrew's Episcopal Church ("Church") and/or Oak Creek Middle School ("School"), in Encinitas, California;

f.     Communications, data, or attachments relating to the research or viewing of news articles and reports about the arsons that occurred at the Church or School in the fall of 2016;

g.     Communications, data, or attachments relating to the motivation for committing the arsons that occurred at the Church or School, including but not limited to evidence of student disciplinary action taken by the San Dieguito Union High School District against Tyler CARENDER;

h.     Communications, data, or attachments relating to the whereabouts of Tyler CARENDER and any criminal associates or co-conspirators at the time of arsons committed at Church or School in the fall of 2016; and

i.     Communications, data, or attachments that tend to provide context to the information described above, such as direct messages sent or received in temporal proximity to any relevant communications, or communications, data, or attachments tending to identify the user of or person with control over the Facebook account, with Facebook User Name "tyler.carender," Facebook ID Account Number 100000987896726, and Vanity Name "Tyler Carender,"

during the time period from April 2010 through present, which tend to prove violations of federal law, including malicious damage to buildings and real property affecting interstate commerce by means of fire and explosive, in violation of 18 U.S.C. § 844(i), malicious damage to a building and real property receiving Federal financial assistance by means of fire, in violation of 18 U.S.C. § 844(f)(1) and (f)(2).